DAVIS and others *v.* LIFE ASSOCIATION OF AMERICA and others.

*(Circuit Court, S. D. Alabama.* December Term, 1881.)

**1. INSURANCE COMPANIES—BRANCHES IN OTHER STATES—CONTINGENT FUNDS.**

Where, under the constitution of a life assurance corporation, organized under the laws of Missouri, the board of directors were authorized to organize branches of the association in different states, under the provisions of the laws of such states, and to enter into and make such agreements and contracts with the trustees or directors of such branches, and that all business should be conducted on the purely mutual plan, and conferring upon each section the benefit of a local organization, and providing that a full reserve or reinsurance

fund shall at all times be kept up, and no dividends be declared, or divisions of surplus be made, which shall impair this reserve, a contract entered into with such a branch corporation to the effect, "that the net assets of the business of said department shall be invested and kept invested within the state of Alabama, provided proper securities, as designated in the constitution, can be obtained; said net assets being the whole of the premiums, less the amount necessary to be held at the present office, St. Louis, Missouri, as a contigent fund, to pay the expenses and losses from year to year, as the same become due aud payable; it being anticipated that such expenses and losses will not comsume more than 25 or 30 per cent. of said premium receipts,"—does not provide that this fund so created and so to be invested, and kept invested, shall be for the benefit and security of the policy-holders of the department of Alabama, or for the particular benefit or security of any policy-holders or persons whatever.

2 SAME—CREATION OF TRUST.

Although no particular form of words is necessary to create a trust, yet if a trust or special security is contemplated, it must be clearly stated or be fairly implied from the language employed.

3. SAME—MEMBERSHIP.

In a corporation organized under the mūtual plan, every applicant for assurance being required to subscribe to the constitution before a policy could be issued admitting him to membership, such members cannot be heard to say that they are not bound by the law of the corporation of which they became and are members.

4. JURISDICTION—CONCURRENT—WHERE FIRST ATTACHES.

Between courts of concurrent jurisdiction the court first acquiring jurisdiction will retain it, and another court will not interfere with such jurisdiction.

In Equity.

*John Little Smith, G. L. Smith,* and *Wm. G. Jones,* for complainants.

*Herndon, Croom & Lewis* and *Carr & Reynolds,* for defendants.

BRUCE, D. J. This suit is brought by John B. Davis and others, policy-holders of the defendant corporation, residents of the state of Alabama, in their own behalf, and in behalf of such other policy-holders of the defendant corporation, of what is called the Alabama department of said corporation, as may join them in and contribute to the expenses of this suit. The defendant corporation was organized under the laws of the state of Missouri, with its principal place of business at St. Louis, in said state, and did business in that and in other states of the Union. In the year 1879 it became insolvent, and upon proceedings instituted in the circuit court of the city of St. Louis, Missouri, the court, on the fourteenth day of October, enjoined the corporation from doing business, and upon the tenth day of November decreed the corporation dissolved. The bill in this case was filed on the twenty-eighth day of October, 1879, in the chancery court of the southern chancery division of the state of Alabama, and the

cause has been removed into this court under the provisions of the act of congress in such cases made and provided.

It is provided in section 2, art. 18, of the constitution of the defendant corporation, as amended October 18, 1868, "that the board of directors shall, by special resolution, organize branches of the association at different points throughout the state of Missouri and the United States, and the business of such branches shall be placed under the supervision of a board of resident trustees."

Section 5 of article 18 provides that the board of directors shall have power to organize such branches under and in accordance with the provisions of the laws of any state or territory of the United States, and when organized such board of directors may enter into such agreements and make such contracts with the trustees or directors of said branches, for the extension and management of the business of this association, as they may deem proper, and all such contracts shall be binding upon this association and all of its branches.

Section 1, art. 20, provides: "No policy shall be issued upon any other than sound lives, and all business shall be conducted upon the purely mutual plan."

Section 3, art. 20, provides: "It shall be the duty of the board of directors to loan the funds of the association, as far as practicable, upon the security of unencumbered real estate situated within the districts from which such funds are derived, thereby conferring upon each section the benefit of a local organization; but no such loan shall be made unless upon the official recommendation of the board of trustees for the district in which such real estate is situated."

Section 6 provides: "A full reserve, (or reinsurance fund,) based upon the assumptions mentioned in section 5 of this article, shall at all times be kept up, and no dividends shall be declared or division of surplus made which shall *impair this reserve.*

It is, perhaps, unnecessary to quote further from the constitution or charter of the defendant corporation.

On the twenty-sixth day of April, 1869, a department of the Life Association of America for the state of Alabama was formed, and a contract was entered into by the Life Association and its Alabama department by which, among other things, it was stipulated in section 5 of the article, which is in writing,—

"That the net assets of the business of said department shall be invested and kept invested within the state of Alabama, provided proper securities as designated in the constitution can be obtained; said net assets being the whole of the premiums, less the amount necessary to be held at the present

office, St. Louis, Missouri, as a contingent fund, to pay the expenses and losses from year to year, as the same become due and payable; it being anticipated that such expenses and losses will not consume more than 25 or 30 per cent of said premium receipts."

It appears that there are assets of the defendant corporation in the state of Alabama, and it is claimed, and is not controverted, that the assets of the defendant corporation in the state of Alabama arose from the premium paid by policy-holders in the branch department of the state of Alabama, and that they do not exceed in amount the reserve fund which the department corporation under said contract, and under the charter of the defendant corporation, was required to keep invested in the department of Alabama; but it is claimed, and it is the theory of the case made by the complainants, that the net assets of the business of the department is what is called in section 6, art. 20, of the constitution of the defendant corporation a full reserve, (or reinsurance fund,) and that this fund was to be kept invested in the department of Alabama as a special and continuing security for the benefit of the policy-holders of the department of the state of Alabama, and that such assets constitute a trust fund, charged with the payment of the policy-holders of the department of Alabama such sums as may be found due to them, to the exclusion of other creditors and policy-holders of the insolvent and dissolved corporation.

This proposition is controverted by John F. Williams, the superintendent of the insurance department of the state of Missouri, appointed under the laws of Missouri, and charged with the duty of winding up the business of dissolved insurance corporations, and who is now the statutory successor of the defendant, the Life Association of America. He, by his counsel in this case, contends that the contract of April 26, 1869, set up by the complainants, does not bear the construction which they placed upon it, that that portion of the assets which, under the fifth section of the contract, was to be invested and kept invested within the state of Alabama, was not intended for the special security of the Alabama policy-holders, or any particular class of policy-holders; that this fund was not and is not a trust fund created for the benefit, specially and exclusively, of the Alabama policy-holders; and that they have no right to have this fund administered for their special and exclusive benefit.

The contention is, further, that if this contract is capable of such a construction as is claimed for it, that it is *ultra vires*, and therefore without authority and void. The constitution of the defendant cor-

poration, section 1, art. 20, provides that all business of the corporation shall be conducted upon the purely mutual plan, and that the construction claimed by the complainants for the contract would be to give to one class of policy-holders and creditors a preference over others, and over creditors of the corporation not the holders of policies, and therefore be violative of the principles upon which the corporation was organized, and upon which the corporation and its operations were to be conducted.

The true construction, then, of the contract of April 26, 1869, is to be determined; and it is to be observed the fifth section, quoted *supra,* while it does provide "that the net assets of the business of said department shall be invested and kept invested within the state of Alabama, yet it is not specific as to the particular purpose and object of such investment. It does not provide that this fund so created and so to be invested, and kept invested, shall be for the benefit and security of the policy-holders of the department of Alabama, or for the particular benefit or security of any policy-holders or persons whatever.

The idea of special security or trust, other than the general trust and security which attaches to the property and assets of a corporation for the benefit of its creditors, is not in the words employed in this fifth section of the contract.

But it is contended that a consideration of the whole scheme and plan of organization and operation of this association, as indicated in its charter, and the laws of the state of Missouri upon the subject of life insurance companies, shows that this fund was intended as a special security for the exclusive benefit of the policy-holders of the department of Alabama. Section 5, art. 18, of the constitution of the association, cited *supra,* providing for the organization of branch departments, with local trustees or directors, and authorized agreements with sub-branches to be entered into for the extension and management of the business of the association, certainly does not furnish the idea that the policy-holders of the branch department were to stand upon different footing, or authorized agreements to be made for special security to the policy-holders of the particular departments which might be organized.

Section 3, art. 20, of the constitution cited, *supra,* providing for the loaning of the funds of the association as far as practicable upon the security of unencumbered real estate situate within the districts from which such funds are derived, thereby conferring upon each section the benefit of a local organization, certainly equally fails to

v.11,no.8—50

show that the security claimed was intended. It is said, what was the purpose of these branch organizations, and what benefit was to arise from such organizations, and from the investment of the funds produced within the department, if it was not contemplated that such investment should be and constitute a special security for the policy-holders of such department?

The benefits that were contemplated in these provisions of the charter may not be very apparent, and may at most be unsubstantiated and of little value, and yet the proposition to leave for investment in the particular departments the largest portion of the fund derived from the business of the association in the particular department, to pass into the channels of trade and business there, instead of being carried to a distant state, is one which the court cannot say would not address itself with force and favor to the minds of a business people. But the provision of the charter which is most relied upon by complainants is section 6, cited *supra*: that a full reserve (or reinsurance fund) at all times be kept up, and no dividends shall be declared, or division of surplus made, which shall impair this reserve.

What is this full reserve, or reinsurance fund, that was to be kept up? It is sometimes called the premium reserve, and it represents the present indebtment of the company by its policies at any time, and is determined by men skilled as actuaries, who ascertain according to certain rules what is at any time the present value of all such outstanding policies, or, what is equivalent, the sum required to reinsure them. *Alabama Gold Life Ins. Co.* v. *Lott*, 54 Ala. 500.

This reserve fund, or premium reserve, was the fund which was to be invested and kept in Alabama, and this amount represented the value, at any time, of the outstanding policies of the Alabama policy-holders, and it is insisted that the fixing of the amount to be kept invested in Alabama at the exact amount necessary to reimburse them, at any time that the association should cease to be a going concern, shows that a special security for such policy-holders was intended, and that the fund thus created and kept, or to be kept, in Alabama is a trust for the payment of the Alabama policy-holders, and the local trustees are charged with the execution of the trust.

But does the fixing of the amount to be kept invested in Alabama, under section 5 of the contract of April 26, 1869, at the full reserve, or premium reserve, referred to in section 6 of the charter, make this fund a special security or trust fund for the benefit of the Alabama policy-holders, or authorize a contract to that effect to be made to carry

out such purpose and interest? It is certainly not so specified, and although no particular form of words is necessary to the creation of a trust, yet if a trust or special security had been contemplated for the benefit of the Alabama policy-holders, as claimed, we should have had a clearer statement of it, for it is not only not expressed but is not fairly implied from the language employed, both in the charter and the contract of April 26, 1869.

The general security of all the policy-holders of the corporation would seem to be a reserve for keeping intact and unimpaired a full reserve fund in each department for the security of the policy-holders generally, without saying that this fund was intended for the special security of the policy-holders of the particular department, the effect of which would be in the case of insolvency to place the policy-holders of the different departments upon a different footing as to security, and be inconsistent with the purely mutual plan upon which the association was organized, and upon which its business was to be conducted.

The Life Association of America was chartered for the purpose of insuring human lives on the mutual plan only. It was not a stock company, but a corporation, in the management and profits of which the policy-holders alone should participate, and the contract of April 26, 1869, must be construed consistently with this principle, if it be capable of such a construction, rather than violative of it.

The conclusion reached, therefore, is that the fund in question is not a fund for the special security of the Alabama policy-holders, and is not a trust charged with the payment of such policy-holders to the exclusion of other policy-holders of the corporation. If this view of the subject be a correct one, then the contract was within the powers granted in the charter of the corporation, and was not *ultra vires;* and if the rights claimed by the complainants did not exist under the contract of April 26, 1869, in the view taken of it, then, of course, they were not imposed by the subsequent legislation of the state of Missouri in reference to insurance, and that subject need not be further considered.

But there is another question which requires consideration. It is that the bill and proof show that we have an insolvent dissolved corporation of the state of Missouri, with assets here in the state of Alabama, and that apart from any contract such as the contract of April 26, 1869, which we have been considering, the court will not allow the assets of this foreign corporation to be taken out of the state to the prejudice and injury of the citizens of Alabama who are

policy-holders and creditors of the insolvent corporation, but will administer assets for their benefit. It may be doubted if the states of the Union are foreign to each other in such sense as to make the principle invoked here applicable; but, if so, this case does not fall within the operation of that rule. As we have seen, this corporation was not a stock company, but was organized upon the mutual plan, and under section 1 of the constitution or charter, as amended October 8, 1868, every applicant for assurance was required to subscribe to the constitution before a policy could be issued admitting him to membership. While it is true that state loans have no extraterritorial force, yet it is true also that corporations of one state may do business in other states, and persons citizens of other states may become members of such corporations.

In the case of *Relfe* v. *Rundle,* 103 U. S. 222, the supreme court of the United States say:

"No state need allow the corporations of other states to do business within its jurisdiction unless it chooses, with perhaps the exception of commercial corporations; but if it does without limitation, express or implied, the corporation comes in as it has been created; every corporation necessarily carries its charter wherever it goes, for that is the law of its existence. It may be restricted in the use of some of its powers while doing business away from its corporate home, but every person who deals with it everywhere is bound to take notice of the provisions which have been made in its charter for the management and control of its affairs, both in life and after dissolution."

The court proceeds in the application of the principles stated:

"By the charter of this corporation, [and the court was speaking of the same corporation of which we are now speaking, the Life Association of America,] if a dissolution was decreed its property passed by operation of law to the superintendent of the insurance department of the state; * * * every policy-holder and creditor in Louisiana is charged with notice of this charter-right, which all interested in the affairs of the corporation can insist shall be regarded."

This reasoning of the supreme court of the United States is an answer to the argument made on this point, and the complainants here cannot be heard to say that they are not bound by the law of the corporation of which they become and are members.

Again, the evidence shows that this suit was brought on the twenty-eighth day of October, 1879, while the suit in the circuit court of the city of St. Louis, state of Missouri, was brought on the fourteenth day of October, 1879; so that the jurisdiction of the circuit court of St. Louis, Missouri, had attached prior to the jurisdiction of the court in this case, brought here in Alabama; and it is a rule of law so well

understood as not to require citation of authority, that as between courts of concurrent jurisdiction, the court first acquiring jurisdiction will retain it, and that another court will not interfere with such jurisdiction.

The result of these views is that the decree is for the defendants, and it is so ordered.

NOTE. Where two suits, involving to a great extent the subject-matter, are brought respectively in a state and a federal court, that court whose process is first served obtains jurisdiction of all questions which legitimately flow out of the subject-matter of the case. *Union Mut. L. Ins. Co.* v. *University of Chicago,* 6 FED. REP. 443. The institution of a suit to foreclose a contract relating to real estate, in a state court, will not deprive the federal court of jurisdiction to foreclose liens against parts of the same real estate where the two suits involve a different controversy. *Hubbard* v. *Bellew,* 3 FED. REP. 447. So where two suits are brought on different facts, seeking different relief, they may be brought respectively in the state and federal court. *Dwight* v. *Cent. Vt. R. Co.* 9 FED. REP. 785. In cases of a dual controversy between different parties, where the union is in no sense due to the plaintiff, the federal court, it seems, has no jurisdiction. *Iowa Home Co.* v. *Des Moines N. & R. Co.* 8 FED. REP. 97. Where the state statute gives a right, the same may be asserted or enforced in the federal courts whenever the citizenship of the parties or the nature of the subject will permit. *Holmes* v. *O. & C. R. Co.* 5 FED. REP. 75. Where, under a state act, proceedings for a dissolution and administration of the property of a corporation are commenced, they must be finally disposed of in the state tribunal, though a valid and subsisting judgment was obtained in the federal court. *Levi* v. *Columbia L. Ins. Co.* 1 FED. REP. 206. The jurisdiction of a United States court is not affected by a subsequent action brought in the state court. *Harris* v. *Hess,* 10 FED. REP. 263. State and federal courts cannot lawfully interfere with each other where each is acting within legal limits. *Walker* v. *Flint,* 7 FED. REP. 435. And a federal court will neither interfere with property in the lawful custody of a state court, nor tolerate interference by a state court with property in its custody, (*Walker* v. *Flint,* 7 FED. REP. 435;) nor can a state court reach funds which have been made by an officer of a federal court on execution, (*Alabama Gold L. Ins. Co.* v. *Girardy,* 9 FED. REP. 142;) but that property is being administered on in a state court is no bar to the proceedings in the circuit court. *Griswold* v. *Cent. Vt. R. Co.* 9 FED. REP. 797. The circuit court has concurrent jurisdiction with the probate court in actions against a county. *Cunningham* v. *County of Rales,* 1 FED. REP. 274; *Payne* v. *Hook,* 7 Wall. 426. The rule of comity towards state courts should not operate to deprive the federal court of its rightful jurisdiction, (*Andrews* v. *Smith,* 5 FED. REP. 833;) but to take advantage of the rule in favor of a state court of concurrent jurisdiction, the point must be seasonably urged. After trial on the merits it is too late. *Gilman* v. *Perkins,* 7 FED. REP. 887.—[ED.